UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| KAREN LAWRENCE, personal representative for the ESTATE OF CHARLES HOFFMAN, | ) ) ) ) | Civil No. 13-383-GFVT |
| Plaintiff | ) ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| V. | ) ) | **ORDER** |
| MADISON COUNTY, ET AL. Defendants | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Karen Lawrence brought this suit following the death of her son inside a jail cell in Madison County, Kentucky.  Lawrence seeks summary judgment with respect to numerous federal and state law claims against Defendant Madison County and six current or former employees of the Madison County Detention Center.  Defendant Christina Greene has individually filed a cross-motion for summary judgment, and the remaining Defendants also jointly seek summary judgment.  For the reasons explained below, the Court will DENY the Plaintiff's Motion for Summary Judgment and GRANT IN PART the Defendants' motions.

**I**

On November 10, 2012, Charles Hoffman committed suicide while in the custody of the Madison County Detention Center ("MCDC").  The story of the events leading to his death is a subject of much dispute in this case, clouded by highly charged accusations, contradictory

testimony, and the natural shortcomings of human memory.[1]  The following account reflects the

Court's best attempt to provide a serious and accurate narrative of the events preceding

Hoffman's death.

In August 2012, Hoffman—a Michigan resident and recent parolee who wore an ankle

monitor as a condition of his release—cut off his monitoring device and fled to Kentucky.  [R.

156-2 at 3-4.]  On October 14, 2012, the Berea police department tracked Hoffman down,

arrested him, and transported him to the MCDC.  At his booking, the deputies provided Hoffman

with a medical questionnaire that asked, among other things, whether he had any illness, any

history of mental health treatment, or any past or present suicidal thoughts.  [R. 156-6 at 1.]

Hoffman answered "no" to each question.  [*Id.*]  The deputies then placed Hoffman in a general

population cell, where he remained for the next few weeks without any trouble.  [R. 156-1 at 3.]

Over the course of several days in the first week of November, Hoffman could not get his

girlfriend to pick up the phone.  According to other inmates, he became increasingly frustrated

by this lack of contact and expressed a desire to move to "the hole," a network of isolation cells

at the detention center, to avoid hearing others talk on the phone.  In an undated letter sent to his

girlfriend while in custody, Hoffman wrote that he "told the cops [he was] about to stab someone

so they would put [him] in the hole."  [R. 156-11 at 1.]  Brent Oliver, an inmate who stayed in

the general population cell with Hoffman, recalls that Hoffman's girlfriend "wouldn't answer the

phone . . . and he was having problems with it," so Hoffman asked Oliver to tell the guards "that

he was going to hurt hi[m]self or hurt somebody . . . so that they could get him out of the cell."

[R. 154-11 at 12.]  Although Oliver thought Hoffman "was joking," he nevertheless reports

---

[1]  Adding to this confusion, Lawrence's counsel embeds his statement of the facts in a maze of bolded, underlined, caps-locked, and italicized declarations.  The Court, however, will not accept counsel's invitation to mistake innuendo for facts, or hyperbole for evidence.

telling officer Scott Belanger[2] that Hoffman "felt like hurting hi[m]self or somebody."  [*Id.* at 18.]  According to Oliver, Belanger then "moved [Hoffman] out of his cell" and placed him in the hole.  [*Id.* at 13.]

For his part, Belanger remembers only that Hoffman "tapped on the window" of his cell that day and told Belanger "he was feeling homicidal and he wanted to come out and sit."  [R. 154-12 at 18.]  Belanger testifies that he then spoke to Defendant Cory Dunning, a police captain working at the facility, about his exchange with Hoffman.  [*Id.*]  Dunning does not remember talking to Belanger, but does recall "talking to the guys in the cell that [Hoffman] was in and asking them what was going on, and they stated that he was threatening to stab people."  [R. 154-24 at 34.]  In an incident report filed thereafter, Dunning noted that Hoffman "was relocated to isolation cell 034 for administrative purposes due to him making statements to other inmates in his cell that he was going to stab them if we didn't move him."[3]  [R. 154-13 at 2.]

Former inmate Elvis Isaacs tells a different story.  On the day in question, Isaacs remembers Hoffman telling inmates that he "felt like he was going to hurt himself or kill

---

[2]  Belanger is not a defendant in this case.

[3]  In her summary judgment motion, Lawrence devotes two pages to a dispute about Hoffman's isolation cell number.  [R. 154 at 5-6.]  She apparently finds it significant that, although most accounts identify cell 34 as the cell in which Hoffman stayed while in isolation, some other records suggest that he also spent time in cell 37.  [*Id.* at 6.]  Lawrence insists that cell 37 "was known to be a suicide cell."  [*Id.*]  She does not explain what it means for a cell to be "known" as "a suicide cell," nor does she attempt to explain the factual or legal significance of this observation.  The evidence cited to support this claim—a portion of inmate Christopher Foster's testimony—also reveals that it was Lawrence's counsel, not Foster, who first characterized the cell as a "suicide cell."  Foster said that, after making suicidal comments, officers placed him in an isolation cell.  [R. 154-18 at 9.]  Lawrence's counsel then ambiguously asked, "do you remember what cell number suicide was?"  Foster responded, "I think it was 37."  Counsel then began referring to cell 37 as "that suicide cell."  [*Id.*]  Regardless of whether some unidentified persons, apart from counsel himself, considered cell 37 to be a "suicide cell," evidence that Hoffman may have been in this cell at some point during his incarceration, without more, would not materially alter any of the Court's findings below.

himself."[4]  [R. 154-18 at 11.]  Isaacs also recalls that Hoffman made a similar threat to "the guards," after which "the guard put him in the hole and g[a]ve him . . . his mat and his sheets like they didn't take him serious[ly] or something."  [*Id.*]  When pressed to identify the guard that heard Hoffman make these comments, Isaacs named Defendant Shawn Moody.  [*Id.*]  He further testified that he could not "remember anyone else from the jail" being present at the time Hoffman spoke to Moody.  [*Id.* at 14.]  Moody, meanwhile, cannot recall the specifics of any conversation he may have had with Hoffman, although he concedes that they likely spoke on a handful of occasions.  [R. 154-21 at 50-52.]  He does not report ever hearing Hoffman threaten to hurt or kill himself.  [*Id.*]

Shortly after Hoffman's placement in the hole, the parties agree that officers moved inmate Christopher Foster into an isolation cell next door, where the two were able to talk through the air vents.  [R. 154-17 at 23.]  Foster and Hoffman bonded over stories about their romantic misfortunes, and eventually Foster asked officers to move him into Hoffman's cell. The night before Hoffman died, Foster remembers that Defendant Tyler O'Brien, a jail deputy, escorted him and Hoffman to a phone station.  After Hoffman's girlfriend "hung up on him," he became "badly depressed" and "angry."  [*Id.* at 14.]  Foster suggests that Hoffman and O'Brien then "sort of had words."  [*Id.*]  At some point—not necessarily during the alleged argument at the phone station—Foster also recalls Hoffman telling O'Brien "that he might hurt himself [] and that he just need[ed] to talk to somebody."  [*Id.* at 22.]  He later clarified that Hoffman "did say he was going to hurt hi[m]self, but [did not use] the 'kill' word."  [*Id.* at 41.]  O'Brien testifies that he has no memory of Hoffman ever telling him he was depressed or that he was going to

---

[4]  In a subsequent section of his deposition, Isaacs may have recanted his testimony that Hoffman suggested he was going to "kill himself."  When asked to clarify whether Hoffman said "he was going to hurt himself or kill himself," Isaacs responded, "He said he was going to hurt hi[m]self."  [R. 154-18 at 5.]

hurt himself, and he does not believe any such conversation ever took place. [R. 154-10 at 51.] He also claims that no other inmate told him Hoffman "was going to hurt himself or was depressed." [*Id.*]

O'Brien's testimony, like Moody's and Belanger's, closely tracks the apparent memory of every other Defendant in this case. According to the Defendants, "during the approximately 72 hours Mr. Hoffman spent in Cell 34, more than thirteen different jail deputies observed or interacted with [him]." [R. 156-1 at 4.] Although "the deputies had a minimum of 60 separate interactions with or observations of Mr. Hoffman," they uniformly report that he "never indicated he was depressed or suicidal." [*Id.*]

Whatever outward signs of trouble he may or may not have expressed, November 10, 2012 was the last day of Hoffman's life. He accepted three meals from jail deputies that day, and no witnesses report any noteworthy events occurring until later that evening. At 5:11 pm, Defendant Christine Greene checked on Hoffman. [R. 1 at 6.] All parties agree that internal MCDC policy required officers to check on isolated inmates "every 20 minutes," and to record each of those check-ins in a daily log. [R. 156-1 at 7.] That did not happen. Instead, over 3.5 hours apparently passed before Greene checked on Hoffman again. Sometime during that period, Hoffman threaded a plastic bag through a small hole in the air vent of his cell. He tied the other end of the bag to his bed sheet, which he shaped into a noose. [R. 154 at 4.] When Greene returned to Hoffman's cell at 8:42 pm, she found him hanging from the ceiling. She immediately called out to O'Brien and Moody, who cut him down and tried to perform CPR. Emergency responders arrived quickly, but he could not be revived, and the coroner pronounced him dead shortly thereafter. [R. 179 at 24-25.]

Not long after the coroner arrived, Kentucky State Police detective Michael Keeton entered the facility to investigate the scene and interview witnesses.  The first person Keeton spoke to was Greene.  Keeton recalls that Greene told him she had checked on Hoffman numerous times between 5:30 and 8:45 on the night of his death.  [R. 180 at 21.]  She reported seeing Hoffman "l[y]ing on his back with his hands behind his head" at around 7:30, at which point he "waved and said he was doing fine."  [*Id.*]  Greene also supplied a log of her visits with Hoffman, which indicated that she had checked on him 21 times between 3:00 and the 8:45.  [*Id.* at 24.]

Unfortunately for Greene, the facility's surveillance video flatly contradicted her story.  Keene discovered that, although the logs recorded Greene checking on Hoffman 21 times through the afternoon and evening, the video showed her passing by his cell on only seven occasions.  [*Id.*]  The video also revealed that Greene "spoke to [Hoffman] briefly" at 5:11, and "then the next interaction with Mr. Hoffman was at 8:42, obviously, when they found him."  [*Id.* at 22.]  When Keeton confronted Greene with this evidence, she first tried to convince him "that the video system wasn't accurate with regard[] to time," to which Keeton responded, "You're wrong.  You're lying again."  [*Id.* at 23.]  Keeton ultimately concluded that the "logs were changed and altered."  [*Id.* at 24.]

Because Keeton was "obviously concerned that . . . she had [gone] back and changed the logs and the sheet," he asked Defendant Doug Thomas, the Madison County Jailer, about the facility's practice of filling out log sheets.  [*Id.* at 24, 37.]  Thomas told Keeton that officers at MCDC "had knowledge that [the logs] were false" and that he "had talked to the staff about not doing that."  [*Id.* at 37.]  Based on his investigation, Keeton found that there "was a history [and] practice" at MCDC of falsifying logs.  [*Id.*]  He qualified, however, that he did not believe

Greene had any reason to suspect Hoffman was suicidal on the day in question, concluding that "she didn't think when she started her shift that day that this was going to happen. There's no doubt about that." [*Id.* at 58.]

Almost a year after her son's death, Hoffman's mother filed this suit. She brings three claims against the individual Defendants under 42 U.S.C. § 1983, including excessive force, conspiracy, and deliberate indifference to Hoffman's serious medical needs. [R. 1 at 8, 11, 14.] Lawrence also charges Madison County and Defendant Doug Thomas with (1) adopting unlawful polices and/or customs that resulted in Hoffman's death and (2) failing to train or supervise MCDC employees. [*Id.* at 12.] Finally, Lawrence brings an assortment of state law claims against the Defendants, including assault and battery, negligence and gross negligence, tampering with evidence, and outrage. [*Id.* at 7, 9-10.]

## II

### A

#### i

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute exists when the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Put differently, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

The moving party has the initial burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, "the nonmoving party must go beyond the pleadings and come forward with specific facts to show there is a genuine issue for trial." *Chao*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). The nonmoving party, however, "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Chao*, 285 F.3d at 424 (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Finally, "[w]hen reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)).[5]

---

[5] The existence of three separate summary judgment motions in this case complicates the Court's application of this standard of review. This is especially true because every party seeks summary judgment with respect to the full range of claims alleged in the indictment, and thus each party consistently occupies a dual role as both the moving and nonmoving party. Rather than attempt the unwieldy task of specifying whom the Court identifies as the moving and nonmoving party in relation to every claim considered below, the Court emphasizes that it has "evaluate[d] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). It necessarily follows that, with regard to those claims that must proceed beyond the summary judgment stage, the Court finds that the facts underlying those claims—even considered in a light most favorable to

**ii**

When measuring the Plaintiff's individual-capacity claims against this standard, the Court must first determine whether the Defendants are entitled to qualified immunity.  Under federal law, the qualified immunity doctrine "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In other words, this doctrine requires the Court to answer two questions: whether the defendant violated a constitutional right, and whether that right was clearly established at the time of the offense.  *Pearson,* 555 U.S. at 232.  The Court may consider these questions in any order, but if the answer to either question is "no," the defendant is immune from suit.  *Id.* at 236.  The plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity, although the Court must still construe the facts in a light most favorable to the plaintiff and draw all reasonable inferences in that party's favor.  *Scott v. Harris,* 550 U.S. 372, 377 (2007).  The qualified immunity doctrine turns on a recognition "that reasonable mistakes can be made as to the legal constraints on particular police conduct," and thus shields "all but the plainly incompetent or those who knowingly violate the law" from suit.  *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (internal quotations omitted) (citations omitted).

---

all nonmoving parties—implicate a genuine and material factual dispute.  And as the analysis below also confirms, where the Court grants summary judgment for the Defendants, the Court finds insufficient evidence in the record to support a reasonable inference in favor of Lawrence's claims, even considered in a light most favorable to her.

**B**

**i**

Before reaching the hard questions raised in this case, the Court should dispense with one category of Lawrence's claims that plainly fails as a matter of law.  To begin, no evidence in the record supports Lawrence's related claims of (1) excessive force under § 1983 and (2) assault and battery under state law.  To determine whether an official used excessive force under § 1983, the Court must ask (1) "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and (2) whether the "pain inflicted" was "sufficiently serious."  *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (internal quotations omitted) (citations omitted).  Under Kentucky law, assault "requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching."  *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. App. 2001).[6]

Here, the only support provided for Lawrence's physical abuse claim is that, in Hoffman's autopsy report, the coroner noted Hoffman had recently suffered an injury of some kind to his scalp.[7]  The medical expert cited by Lawrence confirmed that she "could not opine as to the cause of the injury," and could only "comment that there [was] a healing wound of the scalp.  That's all."  [R. 162-33 at 27.]  No evidence in the record suggests that any Defendant was responsible for this injury.  Despite an abundance of witness testimony, including numerous

---

[6]  As explained in greater detail below, the individual Defendants also enjoy qualified immunity under Kentucky law.  Kentucky's qualified immunity standard, like the federal standard, would require Lawrence to show that the Defendants' threatened or actual use of force was not exercised in good faith. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

[7]  In her interrogatory responses, Lawrence also states she "believes there was physical abuse because [Hoffman's] face was swollen and bruised" after he died.  [R. 156-7 at 7.]  This does not appear to be the opinion of a medical expert, but rather Lawrence's own observation of Hoffman's appearance. Lawrence's subjective impression of Hoffman's "swollen" face following his death is facially insufficient to show that any individual Defendant applied physical force against him, much less that the force was excessive.

inmates who stayed either in the same cell with Hoffman or in a cell nearby, not a single witness ever reported seeing a guard use physical force against Hoffman.

For somewhat puzzling reasons, Lawrence also cites an MCDC incident report that states "[n]o physical force was used" against Hoffman during his transfer to the isolation cell.  [R. 162 at 38.]  Lawrence believes this comment "seems random and out of place," and thus "it certainly could be inferred that force was used against Hoffman, but that Defendants were again trying to cover up their unlawful behavior."  [*Id.*]  The Court's present charge, however, is not to adopt Lawrence's own gratuitous speculation about the conduct of the Defendants, or to presume that a jury might embrace the same unsupported conspiracy theories she now proposes.  Instead, the Court's task is to determine what a jury could reasonably infer from the evidence actually in the record.  Because the record contains no evidence suggesting that any Defendant used physical force against Hoffman, much less that this force was applied in bad faith, Lawrence's claims must fail.

**ii**

The majority of Lawrence's remaining arguments flow from her broad claim that every Defendant showed "deliberate indifference" to Hoffman's serious medical needs.  [*Id.* at 43.]  In evaluating this claim, the Court draws from a well-developed body of case law concerning the liability of jail employees under § 1983 for a prisoner's suicide.  To establish such liability, the plaintiff must show that there was "a strong likelihood [the inmate] would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."  *Barber v. City of Salem*, 953 F.2d 232, 239-240 (6th Cir. 1992).  This test carries both an objective and subjective component.  The objective element requires the plaintiff to show that his medical needs were "sufficiently

serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Evidence "of suicidal tendencies with a strong likelihood that [a prisoner] would attempt to take his own life are sufficiently serious for purposes of the objective component."  *Mantell v. Health Professionals Ltd.*, 612 Fed. Appx. 302, 306 (6th Cir. 2015) (internal quotations omitted) (citation omitted); *see also Russell v. Davis*, 522 Fed. Appx. 314, 317 (6th Cir. 2013) ("We have held that suicidal tendencies are a sufficiently serious medical need, and the parties do not contend otherwise.").

Under the subjective element, a prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  *Woods v. Lecureux*, 110 F.3d 1215, 1222-23 (6th Cir. 1997).  This standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other."  *Farmer,* 511 U.S. at 836.  Put differently, "a prison official may not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal quotations omitted) (citation omitted).  To determine each officer's state of mind, however, the Court cannot impute the knowledge of one officer to another.  *See, e.g., Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (noting "[t]he only conceivable way that any individual officer could have possibly concluded that [the prisoner] was a suicide risk was to have obtained and appropriately pieced together the knowledge of every other officer involved in the case," and holding that a finding of deliberate indifference cannot rest on "collective knowledge.").  To summarize, then, the subjective component requires Lawrence to show that (1) each individual officer subjectively perceived facts from which to draw the inference that Hoffman posed a substantial risk of suicide, (2) each officer did in fact draw that inference or

strongly suspected this inference was warranted, and (3) the officer then disregarded the risk.  *Id.*

Finally, before reaching the substance of Lawrence's deliberate indifference claims against each Defendant, the Court must address Lawrence's flurry of citations to the Defendants' use of the Fifth Amendment.  Lawrence cites *Hoxie v. Drug Enf't Admin.*, 419 F.3d 477 (6th Cir. 2005), for the proposition that "a negative inference can be drawn from a failure to testify in civil proceedings, and [ ] drawing such an inference violates neither the Fifth Amendment nor Due Process."  *Id.* at 483.  The case cited by the court in *Hoxie*, *Baxter v. Palmigiano,* 425 U.S. 308 (1976), also held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.* at 318.

In her motion for summary judgment, Lawrence transforms *Hoxie*'s observation that a negative inference *can* be drawn from a civil defendant's silence into an absolute and far-reaching requirement, declaring that "to every question to which the Fifth Amendment was asserted, this court must make an adverse inference," and such an inference "creates a presumption of liability."  [R. 160 at 36.]  Needless to say, that is not the rule.  The inference drawn from a defendant's silence will always depend on (1) the nature of the question asked and (2) the existence and effect of other evidence, apart from the defendant's failure to testify, that may aid in resolving that question.  As *Baxter* itself clarifies, the Fifth Amendment permits adverse inferences against parties in civil cases "when they refuse to testify *in response to probative evidence offered against them*."  *Baxter*, 425 U.S. at 318 (emphasis added).  *Baxter*, then, does not provide "a blanket rule that allows adverse inferences to be drawn from invocations of the privilege against self-incrimination under all circumstances."  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000).  Instead, "lower courts

13

interpreting *Baxter* have been uniform in suggesting that the key to the *Baxter* holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer." *Id*; *see also Natl. Acceptance Co. of Am. v. Bathalter,* 705 F.2d 924, 932 (7th Cir. 1983) ("We conclude that defendant's claim of privilege should not have been deemed an admission, and that plaintiff should have been put to its proof, either by way of evidentiary support for a motion for summary judgment or at trial."); *United States v. White*, 589 F.2d 1283, 1287 (5th Cir. 1979) ("[A] grant of summary judgment merely because of the invocation of the fifth amendment would unduly penalize the employment of the privilege."); *National Acceptance Company of America v. Bathalter*, 1991 U.S. App. LEXIS 29787, *9 (6th Cir. 1991) ("The defendant and his counsel were aware that a summary judgment motion, *supported by proof*, would be an appropriate mechanism for disposing of the case on the merits if the defendant continued to stand silent.") (emphasis added); *In re Classicstar Mare Lease Litig.*, 823 F. Supp. 2d 599 (E.D. Ky. 2011) ("[A]n adverse inference can only be draw[n] when independent evidence exists as to the facts about which the party refuses to answer."). Thus, in the analysis that follows, the Court will take the Defendants' invocation of the privilege into account where warranted, but must also balance this silence against the existence—or lack thereof—of any other evidence relating to the question that the Defendant refuses to answer.

### iii

Turning at last to Lawrence's specific allegations of deliberate indifference against each Defendant, the Court finds that Lawrence's claims against three individual Defendants—deputies Roberts, Dunning, and Thomas—find little or no support in the record. First, the relevant evidence cited against Roberts amounts to two statements. In Keeton's deposition testimony, Lawrence's counsel asked Keeton if he recalled Roberts telling him that Hoffman was "yelling at

the deputies" and complaining that his family had "vanished off the face of the earth" the day

before his death.  [R. 154-5 at 43.]  Keeton responded that he remembered "some discussion" of

the fact that Hoffman "got upset after a shower on the phone or couldn't make contact with some

family members."  [*Id.*]  In Keeton's summation of his interview with Roberts, he stated that

Roberts told him Hoffman seemed "fine" that night and "[d]idn't appear upset after his shower."

[*Id.* at 47.]  This evidence altogether fails to indicate that Roberts subjectively perceived and then

disregarded a strong risk that Hoffman would commit suicide.  *See Gray v. City of Detroit*, 399

F.3d 612, 614-15 (6th Cir. 2005) (rejecting claim of deliberate inference where inmate did not

express suicidal thoughts but was nevertheless "ranting," "talking loud," destroying property,

and exhibiting "mood swings all day"); *Galloway v. Anuszkiewicz*, 518 Fed. Appx. 330, 334 (6th

Cir. 2013) (finding jailer did not perceive substantial risk of suicide even though prisoner "had a

suicide precautions blanket and was under observation every fifteen minutes for odd and

aggressive behavior," where prisoner had not previously harmed himself or expressed suicidal

thoughts).  Even accepting that Hoffman's behavior might have demonstrated *some* risk of

suicidal tendencies, the only question before the Court is whether the evidence supports a

reasonable inference that Roberts subjectively perceived, and then chose to disregard, a *strong*

risk of suicide.  *See Galloway*, 518 Fed. Appx. at 336 (holding that, even though facts could

support an inference that "the decedent *may* or *could* have been considering suicide," that "does

not reasonably lead to the conclusion that [the defendant] contemplated, but then disregarded, a

*strong likelihood* of suicide.") (emphasis in original).

Lawrence's counsel also asked Roberts if, in his interview with Keeton following

Hoffman's death, he ever stated that Hoffman "was going to do it one way or another, it seemed

to [him]."  [R. 169 at 38.]  Counsel provided no context for this alleged comment, and Roberts

15

responded that he did not recall making it. [*Id.*] Lawrence would apparently like the Court to assume that (1) Roberts actually made this statement and (2) the alleged comment indicates he knew Hoffman was going to commit suicide "one way or another" before the suicide ever occurred, rather than that Roberts came to believe—after the fact—that Hoffman's suicide was unavoidable. Not only is there no evidence in the record to support Lawrence's proposed interpretation, but such a construction would be plainly inconsistent with both (1) all of Roberts's actual testimony and (2) Keeton's own characterization of the interview in question. Roberts has repeatedly denied ever believing that Hoffman posed a risk of suicide, and Keeton expressly stated that Roberts told him Hoffman seemed "fine" during their interaction. [R. 169 at 20-21, 154-5 at 43.] Keeton relatedly emphasized that he received "no indication whatsoever" from any Defendant that Hoffman appeared to be a suicide risk. [R. 154-5 at 46.] Lawrence's tortured interpretation of this single alleged statement, out of context and without supporting evidence, provides no reasonable grounds for concluding that Roberts subjectively perceived and then disregarded Hoffman's strong suicidal tendencies. *Cf. Griffin v. Hardrick,* 604 F.3d 949, 954 (6th Cir. 2010) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

For many of the same reasons that Lawrence's allegations against Roberts cannot proceed, her claims against Defendant Cory Dunning also fail. The only relevant evidence cited against Dunning is an incident report in which he states that Hoffman "was relocated" to an isolation cell "due to him making statements to the other inmates in his cell that he was going to stab them if we didn't move him." [R. 154-13 at 2.] As explained above, Dunning's mere knowledge of Hoffman's "odd or aggressive behavior" toward *others*, standing alone, is not

enough to suggest that he subjectively perceived a substantial likelihood that Hoffman would commit suicide. *See, e.g., Gray*, 399 F.3d at 619 (holding city and its agents were not liable for deliberate indifference to suicide risk where "the plaintiff never made any statements that could reasonably be interpreted as threatening to harm *himself*, and none of his destructive acts were self-directed.") (emphasis added).  Likewise, the possibility that Hoffman's aggressive statements might implicate *some* risk of suicide "does not reasonably lead to the conclusion" that Dunning "contemplated, but then disregarded, a *strong likelihood* of suicide." *Galloway*, 518 Fed. Appx. at 336 (emphasis in original); *see also Cooper v. County of Washtenaw*, 222 Fed. Appx. 459, 469-70 (6th Cir. 2007) (finding evidence "show[ed] at most that [an officer] should have known that [the inmate] was suicidal, which is insufficient for a deliberate indifference claim.").  The Court notes, too, that the standard medical questionnaire supplied to Hoffman during the booking process listed Dunning as his interviewer.[8]  [R. 156-6 at 1.]  On this questionnaire, Hoffman stated that he had no mental health issues and no past or present suicidal thoughts.  [*Id.*]  Given (1) Hoffman's initial confirmation that he had no past or present suicidal thoughts and (2) the lack of evidence otherwise indicating that Dunning was aware of Hoffman's strong suicidal tendencies, the Court finds no evidence to suggest that Dunning showed deliberate indifference to Hoffman's serious medical needs. *Cf. Schultz v. Sillman*, 148 Fed. Appx. 396, 403 (6th Cir. 2005) (holding evidence of inmate's aggressive and destructive behavior supported deliberate indifference claim only "in light of his prior history" of known suicide attempts).

---

[8]  The Court notes that, in his deposition testimony, Dunning could not recall the specifics of Hoffman's booking process, and acknowledged the possibility that some other officer could have filled out the form using his login credentials.   [R. 154-4 at 40-41.]  No evidence suggests this occurred.

Finally, the evidence cited against Defendant Doug Thomas also fails to demonstrate deliberate indifference to Hoffman's strong suicidal tendencies.  Lawrence does not allege that Thomas interacted with Hoffman or observed any behavior suggesting that he posed a substantial suicide risk.[9]  Instead, she discusses at length the practice of filling out log sheets at the facility, and disputes Thomas's testimony about other officers' compliance with internal MCDC policy. [R. 154 at 30-31.]  Although this evidence may prove relevant to Lawrence's claims regarding municipal liability, it is largely irrelevant to her individual-capacity claim of deliberate indifference.  Here, Lawrence must show far more than Thomas's arguable acquiescence to MCDC employees' history of falsifying log sheets; rather, she must show that Thomas perceived and then disregarded a substantial risk that Hoffman would take his own life.  Further, to the extent that Lawrence alleges inadequate training or supervision on the part of Thomas, the mere fact that he exercised supervisory control over MCDC employees cannot support an inference of liability under § 1983.  Instead, Lawrence must allege that Thomas "either encouraged the specific incident[s] of misconduct or in some other way directly participated in [them]."  *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted) (internal quotations omitted). Although the record may support Lawrence's claim that Thomas encouraged and/or participated in the MCDC's history of falsifying log sheets, no evidence indicates that he specifically encouraged and/or participated in an effort to disregard Hoffman's strong suicidal tendencies.[10]

---

[9]  Lawrence does claim that Foster "told Keith Trickler and Defendant Doug Thomas that Hoffman had told the guards that he was going to hurt himself."  [R. 154 at 20.]  Foster's deposition transcript, however, shows that he only made this comment to Trickler; Foster simply mentions Thomas as someone whose shift began around the time he spoke to Trickler.  [R. 184 at 18.]  More importantly, Lawrence fails to mention that Foster only claims to have made this comment *after* Hoffman had already committed suicide.  [*Id.* at 20.]

[10]  The Court also notes that Dunning apparently operated in some kind of supervisory capacity, although Lawrence does not bring inadequate supervision or training claims against him.  Regardless, the same analysis applied to Thomas above is equally applicable to Dunning.

**iv**

The claims asserted against the next officer, Defendant Christina Greene, require a more complicated analysis.  This is true for two reasons.  First, Lawrence devotes a tremendous amount of energy to charting each instance in which Greene invoked the Fifth Amendment.  [R. 154 at 13-17.]  As previously stated, however, courts "have been uniform in suggesting that an adverse inference" arising from a civil defendant's silence "can only be drawn when independent evidence exists of the fact to which the party refuses to answer."  *Glanzer*, 232 F.3d at 1264.  A review of Greene's deposition shows that the questions asked by Lawrence's counsel were not grounded in independent evidence.  Instead, counsel employed a shock-and-awe approach to deposition questioning, peppering Greene with dozens of imagined scenarios and hoping the Court would draw an adverse inference each time she declined to respond.[11]  Counsel began by asking Greene if "Hoffman told [her] he was going to hurt himself, he needed help," to which Greene replied, "No."  [R. 164 at 12.]  Counsel immediately responded by asking, "Mr. Hoffman told you he was going to hurt himself, didn't he?"  [*Id.*]  Greene again replied, "No."  [*Id.*]  Counsel asked yet again, "Mr. Hoffman told you he needed help, didn't he?"  [*Id.*]  And again Greene replied, "No."  [*Id.*]  Unfazed, counsel proceeded to ask Greene dozens of deeply repetitive questions about her knowledge of Hoffman's suicidal tendencies, most of which Greene refused to answer on the advice of her attorney.[12]

---

[11]  In addition to asking Greene questions about her own subjective perceptions, counsel also attempted to ask questions about other Defendants' knowledge of Hoffman's suicidal tendencies.  For example, counsel asked, "isn't it true that Mr. Hoffman told Mr. Dunning he was going to hurt himself?"  [R. 154 at 15.]  Lawrence apparently believes that Greene's silence should not only implicate *her*, but should also implicate any other Defendant mentioned in counsel's spate of questioning, even in the absence of independent evidence to support Lawrence's indiscriminate accusations.  If Greene's silence, without supporting evidence, cannot support Lawrence's claims against her, it certainly cannot support Lawrence's claims against other Defendants who were not even present at the deposition.

[12]  The following is a representative sample of these questions: "You failed to document Mr. Hoffman told you he needed help?" [R. 154 -26 at 13]; "You failed to document the fact that Mr. Hoffman told you

To determine the significance of Greene's silence, the Court must look to the evidence otherwise in the record.  This investigation reveals the second complication built in to Lawrence's claim against Greene—namely, that she likely engaged in a scheme to cover up her failure to check on Hoffman as frequently as MCDC policy required.  The record strongly supports Lawrence's allegation that Greene violated this policy, falsified records to conceal that violation, and lied to an investigator about both the violation and the concealment.  Lawrence would have the Court conflate this alleged wrongdoing with the entirely separate claim alleged here—if Greene falsified the log sheets, Lawrence's reasoning goes, she must also be liable for consciously disregarding a substantial risk that Hoffman would commit suicide.  But that conclusion does not logically follow from Greene's alleged misconduct.  To find a reasonable basis for believing that Greene subjectively perceived and then disregarded Hoffman's strong suicidal tendencies, the Court must still locate some evidence in the record to support Lawrence's claim.  Lawrence's argument—which ultimately amounts to "if she did one bad thing, she probably did another"—is not a reasonable inference drawn from evidence actually in the record.  It is unsupported speculation.  And the Court will not use such speculation as a basis for granting or denying a motion for summary judgment.

---

that he was depressed and he needed to see somebody in medical?" [*Id.*]; "Tyler O'Brien told you that we should document and make sure that Mr. Hoffman gets the help he needs, didn't he?" [*Id.*]; "You discussed with Tyler O'Brien the fact that Mr. Hoffman was going to hurt himself?" [*Id.* at 14.]; "You told Tyler O'Brien yourself that you knew that Mr. Hoffman was going to hurt himself and failed to take any action?" [*Id.* at 14-15]; "Did you tell Doug Thomas that you heard Tyler O'Brien, or you discussed with Tyler O'Brien the fact that Mr. Thomas – or Mr. Hoffman needed help and was in danger of harming himself?" [*Id.*at 21]; "Did you tell Doug Thomas that Mr. Hoffman was suicidal?" [*Id.*]; "Is it true that you had a discussion with Tyler O'Brien about Mr. Hoffman being suicidal before he actually committed suicide?" [*Id.* at 22.]; "Isn't it true that Tyler O'Brien failed to document the fact that Mr. Hoffman told you that he was going to hurt himself in that incident report?" [*Id.* at 39-40]; "And would you agree with me that Mr. Hoffman told you and other deputies on the second shift that he was going to hurt himself on November 9th, 2012?" [*Id.*]; "And Mr. Hoffman, in fact, told you that he was going to hurt himself and you failed to take action; isn't that true?" [*Id.* at 49.]

The Court recognizes, too, that Lawrence has repeatedly tried to elicit testimony from witnesses that would support her claim against Greene.  Despite her best efforts, no witness ever reported Hoffman telling Greene that he was going to hurt himself.  Lawrence does attempt to argue, however, that Foster's testimony "clearly establishes" Greene "was aware of Hoffman's threat to hurt himself."  [R. 154 at 46.]  But that, under the most charitable interpretation of Lawrence's claim, is a gross mischaracterization of Foster's testimony.  In the portion of Foster's deposition cited by Lawrence, Foster only tells Lawrence that Hoffman told O'Brien, not Greene, that he was going to hurt himself.  [R. 154-17 at 16.]  Counsel then asked Foster if Hoffman also told "Greene that he was going to hurt himself," to which Foster responded, "I'm not sure."  [*Id.*]  Unsatisfied, counsel then asked Foster if he ever gave a "statement that [Hoffman] told Greene that he was going to hurt himself," to which Foster again replied, "I'm not for sure on her, but I know he told [O'Brien] because I was there when he told [O'Brien]."  [*Id.*]

Other testimony also contradicts Lawrence's claims.  In Keeton's deposition, for example, Lawrence's counsel asked Keeton if, in the course of his investigation, it ever "dawn[ed]" on him "that maybe [Greene] was maybe covering up the fact that he was hurt – going to hurt himself and she just didn't tell anybody about it."  [R. 154-5 at 45.]  Keeton responded, "I don't believe that at all."  [*Id.*]  He further emphasized that he "had no indication" Greene or any other Defendant believed that Hoffman was a strong suicide risk, adding that he thought Greene lied only "to cover up the fact that she had made up the logs."  [*Id.* at 45-46.]

In short, the record suggests that Greene did a bad thing.  But the Court's present task is not to punish Greene generally for bad behavior—instead, the Court must find reasonable grounds to conclude that Greene showed deliberate indifference to Hoffman's strong suicidal

tendencies.  Because nothing in the record indicates that Greene subjectively perceived and then disregarded a substantial likelihood that Hoffman would commit suicide, Lawrence's claim must fail.

**v**

Unlike the preceding Defendants, the record does provide some support for Lawrence's deliberate indifference claims against Defendants Tyler O'Brien and Shawn Moody.  As previously described, Foster testified that Hoffman and O'Brien had a heated exchange the night before Hoffman's suicide.  [154-17 at 14.]  Hoffman allegedly became "badly depressed" and "angry" after his girlfriend "hung up on him," after which he and O'Brien "sort of had words." [*Id.*]  Around this time, too, Foster remembers Hoffman telling O'Brien "that he might hurt himself" and "that he just need[ed] to talk to somebody."  [*Id.* at 22.]  Similarly, Isaacs testified that he remembers Hoffman telling Moody that he "felt like he was going to hurt himself or kill himself," although he later stated only that Hoffman told Moody "he was going to hurt hi[m]self."[13]  [R. 154-18 at 11.]  Issacs recalls that Moody then "put him in the hole and g[a]ve him . . . his mat and his sheets like [he] didn't take him serious[ly] or something."  [*Id.*]  O'Brien and Moody both suggest that they cannot recall these conversations.

These facts support a reasonable inference that Hoffman (1) told O'Brien he felt like hurting himself and (2) told Moody he felt like hurting or killing himself.  The record also reasonably indicates that O'Brien and Moody did not place Hoffman on suicide watch or otherwise address his apparent desire to hurt himself.  These failures provide sufficient support for Lawrence's claim that O'Brien and Moody disregarded a substantial risk to Hoffman's safety.  *See Coleman v. Parkman,* 349 F.3d 534, 539 (8th Cir. 2003) ("The jury could reasonably

---

[13]  Foster also said that, while Hoffman was still in a general population cell, "[h]e told [a guard] he was going to hurt hi[m]self.  I think it might have been Moody at the time."  [R. 184 at 21-22.]

deduce that appellants recklessly disregarded [the inmate's suicide] risk when they issued [him] a bed sheet and placed him in a cell where they could not easily observe him.").

The Defendants nevertheless claim that these facts, without more, cannot support the inference that O'Brien and Moody were deliberately indifferent to Hoffman's strong suicidal tendencies.  In support, they cite *Mantell v. Healh Prof'ls Ltd.*, 612 Fed. Appx. 302 (6th Cir. 2015).  In *Mantell*, an inmate's girlfriend told his arresting officer that he had a history of suicide attempts and needed to be placed on suicide watch.  *Id.* at 303.  The officer told deputies at the jail about this conversation, but those deputies failed to relay this information to the facility's medical staff.  The staff later found no evidence of suicidal tendencies during the inmate's medical screening and placed him in a general population cell.  *Id.* at 304-05.  He hung himself the next day.  *Id.* at 305.  Still, the court found the girlfriend's "bald report of concern," coupled with a medical assessment indicating "a single suicide attempt some five years in the past" but no present suicidal thoughts, was insufficient to establish deliberate indifference on the part of the deputies.  *Id.* at 307.

The Defendants assert that "[s]imilarly here, the sole basis for a claim that [the Defendants] acted with deliberate indifference is a bald statement by one inmate that he overheard Mr. Hoffman indicated he might hurt himself."  [R. 156-1 at 18.]  They also insist that "this case actually presents stronger facts for summary judgment than *Mantell*, because the guards in *Mantell* were also aware that the inmate had a prior history of suicide attempts when they booked him."  [*Id.* at 19.]  These arguments, however, rely on a twisted construction of *Mantell*'s reasoning.  The "bald report" in *Mantell* concerned a statement by the inmate's girlfriend to an arresting officer; here, by contrast, the "bald statement" comes in the form of sworn testimony by two inmates who directly observed the disputed interactions between

Hoffman and the Defendants.  More importantly, these statements are not merely "reports of concern," but descriptions of actual communication between Hoffman and the deputies.  Unlike *Mantell*, where the deputies only heard reports of a third party's concern relayed by an intermediary, the deputies here spoke directly to Hoffman, who allegedly told each Defendant that he felt like hurting himself.  An inmate's present statement that he feels "like hurting himself," communicated directly to the deputies responsible for his care, provides far more cause for concern than a guard's mere knowledge of a prisoner's prior history of suicide attempts. *Mantell* itself recognized this contrast, distinguishing its own facts from those cases where "officers were not only advised by witnesses that the inmates in question were at risk of suicide," but were also aware of the inmate's own "requests for assistance" or "patently suicidal []" behavior."  *Id.* at 306-07; *see also Bonner-Turner v. City of Ecorse*, 627 Fed. Appx. 400, 408-09 (6th Cir. 2015) (holding officers' "subjective knowledge of substantial risk [of suicide] may be reasonably inferred from their actual exposure to [an inmate's] statements and behavior.").

Finally, although the Defendants do not attempt to highlight the fine distinction between Hoffman's threats to "hurt" rather than "kill" himself, the Court does recognize that evidence of an explicit threat to kill himself would provide even stronger support for Lawrence's claim.  The Court does not conclude, however, that such a distinction provides reasonable grounds for granting summary judgment in favor of O'Brien and Moody.  To hold otherwise would essentially require an inmate to announce "I am going to kill myself," or otherwise outwardly begin the process of attempting suicide, before his interaction with officers could support a reasonable inference of liability under § 1983.  That cannot be the rule.  The Court finds, then, that Hoffman's direct threats to Moody and O'Brien support a reasonable inference that each officer subjectively perceived and then disregarded Hoffman's strong suicidal tendencies.  The

24

Court also recognizes, however, that other evidence—including the testimony of O'Brien, Moody, and Keeton—supports a different conclusion. The weight to afford these competing statements is for a jury, not the Court, to determine. For this reason, the Court will deny both parties' motions for summary judgment with respect to these two claims, leaving any issues of credibility to the ultimate trier of fact.

## C

Having established that Lawrence's deliberate indifference claims against Defendants O'Brien and Moody raise a triable issue of fact, the Court now turns to Lawrence's related allegation of conspiracy. To raise a civil conspiracy claim under § 1983, plaintiffs must show "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Evidence of an "[e]xpress agreement among all the conspirators is not necessary to find the existence of a civil conspiracy." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Instead, "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.* Because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks* 229 F.3d 514, 528 (6th Cir. 2000) (alteration in original). At the same time, "circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct." *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).

Because the record only supports Lawrence's claims of deliberate indifference against O'Brien and Moody, any unlawful conspiracy to disregard Hoffman's suicidal tendencies must involve these two individuals.  Moody recalls that, on the day of Hoffman's suicide, Hoffman asked Moody to move him out of the hole.  [R. 165 at 31.]  Moody also admits that he spoke to O'Brien about Hoffman's desire to leave isolation, although he indicates that he cannot remember the details of their conversation.  [*Id.* at 38-39.]  Further, the incident report filed after Hoffman's suicide shows that both men were working at the facility on the night of Hoffman's death.  [R. 154-15 at 2.]  This evidence reasonably supports an inference that (1) Moody and O'Brien independently received information suggesting that Hoffman posed a strong risk of suicide, (2) they worked together on the night of his suicide, (3) they spoke about Hoffman's desire to leave his cell that same day, and (4) they each failed to take steps necessary to ensure Hoffman's safety.

At best, this evidence could only provide circumstantial evidence of an agreement between Moody and O'Brien.  But "circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct."  *Re/Max Intern.*, 173 F.3d at 1009.  Here, the record reasonably suggests only that, on separate days and without the other officer present, Hoffman told Moody and then O'Brien that he felt like hurting himself.  Moody and O'Brien then continued to work at the facility, sometimes alongside each other, and once discussed Hoffman's desire to leave his isolation cell.  On these facts, the Court cannot reasonably conclude that the officers' actions were more consistent with a conspiracy than with independent conduct.  Lawrence's conspiracy claim therefore cannot proceed.  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (affirming lower court's judgment that circumstantial evidence against police officers did not support conspiracy claim and finding the

officers' conduct was "just as consistent with independent conduct as it [was] with a conspiracy."); *see also Womack v. Conley*, 595 Fed. Appx. 489, 494 (6th Cir. 2014) (holding that, "[b]ecause these pieces of circumstantial evidence are just as consistent with" routine police conduct, "the district court did not err in holding that the evidence is insufficient to support an inference of conspiracy.").

Wight regard to the remaining Defendants, Lawrence also claims that each Defendant conspired to (1) violate MCDC's policy of checking on isolated inmates every 20 minutes and (2) falsify log sheets to conceal this violation. She relatedly argues that the Defendants had a history of "ma[king] up the time that they checked on inmates, when in fact, they had not." [R. 162 at 40.] According to Lawrence, this history of violating MCDC policy reflects a conspiratorial objective to deprive Hoffman of his constitutional rights.[14]

There are two problems with this claim. First, Lawrence presumes that the Defendants' violation of MCDC policy was a *per se* violation of Hoffman's constitutional rights. It was not. *See, e.g., Cooper*, 222 Fed. Appx. at 470 (rejecting plaintiff's claim "that the fact that [the defendant] violated [internal facility] security procedures by not at least checking on [the prisoner] after the requisite thirty minutes should give rise to the presumption that he acted

---

[14] The Court also notes that, while she does not raise this claim in her summary judgment motion, Lawrence's complaint additionally charges the Defendants with conspiracy to "cover up their unlawful and illegal acts and/or omissions." [R. 1 at 8.] The Court finds no evidence to suggest that anyone but Greene attempted to falsify logs following Hoffman's death; in any event, actions taken by the Defendants *after* Hoffman's death cannot support a claim of conspiracy to violate his constitutional rights. *See, e.g., Judge v. City of Lowell*, 160 F.3d 67, 76 n. 15 (1st Cir.1998) ("[A]ll of the actions that form the basis of [the plaintiff's] claims occurred subsequent to [the decedent's] death. At that time, [the decedent] had no rights of which he could be deprived."); *Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 749 (10th Cir.1980) ("[T]he civil rights of a person cannot be violated once that person has died"), *Ford v. Moore*, 237 F.3d 156, 165 (2d Cir. 2001) (rejecting claim of post-death deprivation of decedent's constitutional rights and noting "whatever post-death claim the Plaintiff might have in her capacity as administratrix [] has not been alleged.").

unconstitutionally," and noting "[a] violation of internal policy does not *ipso facto* give rise to a presumption of unconstitutionality.") (citation omitted); *see also Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) ("To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law . . . [and] if adopted, would encourage all governments to adopt the least restrictive policies possible."). Instead, as explained above, the relevant constitutional inquiry requires the Court to consider (1) the officer's subjective perception of Hoffman's serious medical needs and (2) the steps taken to address those needs. *See, e.g, Woods v. Lecureux,* 110 F.3d 1215, 1222 (6th Cir. 1997). To establish a conspiracy here, then, Lawrence must demonstrate more than a general plan to violate MCDC policy—rather, she must show that the Defendants (1) were aware of Hoffman's strong suicidal tendencies and (2) shared a plan to disregard that risk. Thus, the Defendants' apparent violation of MCDC policy on a general or periodic basis, standing alone, is insufficient to demonstrate a shared objective to deprive Hoffman of his constitutional rights.

Second, Lawrence's conspiracy claim must also include evidence of the Defendants' intent to deprive *Hoffman* of his constitutional rights. In general, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotations omitted) (citation omitted). The decision to violate MCDC policy on previous occasions may or may not have deprived *other* inmates of their constitutional rights, depending on the unique psychological needs of those inmates, the officers' awareness of those needs, and the steps taken to address them. But because the constitutional question requires a fact-intensive, case-by-case analysis of each inmate during a specific time period, this past history is irrelevant to the narrow question before the Court. *See Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015) (finding

plaintiffs' § 1983 conspiracy claim failed because they "were required to show that the remaining individual Defendants shared a common plan to violate *their* constitutional rights," and "[w]hile the remaining individual defendants may have been involved in framing other [parties], Plaintiffs produced no evidence that any of them personally participated in framing [the plaintiffs].") (emphasis in original).  Without evidence of the remaining Defendants' intent to violate Hoffman's constitutional rights, Lawrence's conspiracy claims against these Defendants must fail.

## D

Lawrence directs her last federal claim against Madison County itself.[15]  To succeed in her claim against the County under § 1983, Lawrence must show that (1) MCDC officers deprived Hoffman of his constitutional rights and (2) the County is responsible for that deprivation.  *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  To demonstrate that the County is responsible, Lawrence must prove that a "policy or custom" of the County actually "caused the alleged injury."  *Id.*  Because the record only supports Lawrence's constitutional claims against Moody and O'Brien, the Court's investigation begins with the apparent causal connection between (1) Moody's and O'Brien's allegedly unconstitutional conduct and (2) the policies or customs of the County.[16]  *See, e.g., Cooper,* 222

---

[15]  In addition to naming Madison County as a Defendant, Lawrence also sues every Defendant in his or her official capacity.  Because these claims represent a *de facto* allegation against Madison County, the Court will not separately address Lawrence's official-capacity claims against each Defendant.  *See Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992) ("[A] section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself.").

[16]  To find the County liable for any of its alleged policies or customs, the Court must also determine that an official with final policymaking authority implemented or deliberately permitted the conduct in question.  *See Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005).  An official has such authority when, for example, he "formulates plans for the implementation of broad goals" and his "decisions are final and unreviewable and are not constrained by the official policies of superior officials."  *Id.* at 814 (internal quotations omitted) (citations omitted).  Thomas is the Jailer of Madison County, an elected position that gives him ultimate supervisory authority over jail employees.  The Court finds, and the parties apparently do not dispute, that Thomas had "policymaking authority" within the

Fed. Appx. at 473 (holding plaintiff's municipal liability claim "is inextricably linked to the plaintiff's first claim: If the individual defendants have violated no constitutional right, the municipality cannot be liable under § 1983"); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.").

The Court finds no evidence of an official policy underlying or motivating Moody's or O'Brien's behavior, and Lawrence apparently does not argue that such a policy existed.  Instead, she cites the Supreme Court's recognition that local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978).  This custom "must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell,* 436 U.S. at 691).  Even if the Court discovers evidence of a custom with some indirect causal relationship to the officers' conduct, that discovery is not enough to find the County liable.  Instead, this inquiry requires evidence of "a direct causal connection between the policies or customs of the [County] and the constitutional injury to the plaintiff," and "[r]espondeat superior or vicarious liability will not attach [against the County] under § 1983." *Gray*, 399 F.3d at 617.

One way to establish causation is to show that a local government's custom of "inadequate training or supervision" led to the alleged deprivation.  *Id.*  This claim requires Lawrence to "prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the [County's] deliberate indifference; and (3)

---

meaning of the case law.

the inadequacy was closely related to or actually caused the injury." *Id.*   Relatedly, where a plaintiff alleges that "liability should attach against a municipal entity by virtue of prevailing custom . . . [of] institutional inaction in the face of violations of substantive due process," the plaintiff must show "(1) the existence of a clear and persistent pattern of mistreatment of detainees; (2) notice or constructive notice on the part of the County; (3) the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the County's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005).

In applying these standards, "[v]ery few cases have upheld municipality liability for the suicide of a pre-trial detainee." *Gray* 399 F.3d at 618.  To show "deliberate indifference" in this context, the Court must find that the County ignored "obvious risks of suicide that are foreseeable." *Gray*, 399 F.3d at 618.  This standard "remains distinct from mere negligence," and "[w]here a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability." *Id.* at 618 n. 1.  In the analysis that follows, then, the Court will look for (1) a "permanent and well-settled custom" of the County that (2) led supervisors to ignore "obvious risks of suicide that [were] foreseeable" and (3) served as the "moving force" behind Moody's and/or O'Brien's alleged misconduct.

The Court finds substantial evidence in the record to support Lawrence's claim that MCDC officers had a history of failing to check on isolated inmates as often as internal policy required.  Detective Keeton testified that employees habitually falsified check-in logs to conceal these failures.  Thomas admitted to Keeton that he "had knowledge [the logs] were false" and "had talked to the staff about not doing that."  [R. 154-5 at at 37.]  Keeton likewise reports that,

31

"based on [his] interviews, the other deputies admitted to [falsifying logs] as well.  It was just something that happened.  Even some former deputies who are no longer employed there, I discussed this matter with and they [said] that's how they [did] it."  [R. 154-5 at 43.]  Ken Katsaris, an expert employed by Lawrence who instructs and trains "corrections officers with respect to handling jail inmates who are mentally ill," also testified that his review of MCDC records indicated it was "the custom of the corrections officers to not abide by" the check-in policy.[17]  [R. 154-32 at 142.]  Katsaris stated that "[e]ven though they recognized there was such a policy and even though the jail acknowledged they knew they had such a policy, everyone in the jail, including the jailer and the major, agreed that it was not followed.  I've never seen a better custom-and-practice claim in life."[18]  [*Id.* at 143.]  And when counsel asked the Defendants if they had ever violated the facility's check-in policy, every Defendant invoked the Fifth Amendment.  [R. 154-26 at 17-18, R. 154-10 at 105, R. 154-21 at 10, R. 154-24 at 49, R. 154-29 at 14, and R. 154-30 at 17.]  Because independent evidence supports this claim, the Defendants' silence bolsters the inference that officers violated the policy.

Other evidence also reasonably suggests that MCDC supervisors failed to manage and discipline employees properly.  In addition to permitting officers to falsify logs, Thomas admitted that he had "no set disciplinary process" for dealing with officers' misconduct, and

---

[17]  Katsaris also found that MCDC's three shifts handled inmates' mental health issues differently.  After reviewing facility records, Katsaris concluded that there was "a degree of chaos, maybe, between the shifts," and "to some degree, it almost appeared like they were operating three separate facilities."  [R. 154-32 at 37.]  For example, "observations [of inmates were] done differently," and some shifts would "tend to say somebody [was] under suicide watch, when on another shift they [didn't] handle it as a suicide watch."  [*Id.*]  Katsaris clarified, however, that these inconsistencies were "not something that [he] found specifically related to Mr. Hoffman."  [*Id.*]

[18]  While Katsaris may be an expert in training corrections officers, he has no legal training.  Although he may opine about (1) the facility's custom of failing to check on isolated inmates as frequently as MCDC policy required and (2) the potential impact of that failure on prisoners' medical needs, the Court will afford little weight to his unsolicited legal analysis.

might choose to do "a write-up" or simply "talk to [the officer] verbally."  [R. 154-30 at 30.]  O'Brien recalled that, between 2009 and 2012, he received "zero" performance evaluations.  [R. 154-10 at 73.]  Greene told Detective Keeton that she had "never seen a policy and procedures manual the whole time she worked at [MCDC]."  [R. 154-5 at 110.]  And Moody testified that he sometimes watched movies and/or "dozed off" on the job, although supervisors never formally disciplined him for this behavior.  [154-21 at 11.]

Faced with this evidence, a reasonable jury could find that Thomas (1) did not formally evaluate deputies at the facility and (2) sometimes failed to discipline employees for violating MCDC policy.  And as previously stated, the record reasonably supports the conclusion that (3) many of these deputies had a history of failing to check on isolated inmates as often as internal policy required, and (4) Thomas was complicit in this failure.  A jury might also conclude that, by permitting officers to check on isolated inmates infrequently, Thomas handicapped officers' ability to identify quickly the serious medical needs of inmates entrusted to the facility's care.

But this is not the end of the analysis; the Court must also locate evidence that these customs were the "moving force" behind Moody's and/or O'Brien's alleged deliberate indifference to Hoffman's strong suicidal tendencies.  *Miller*, 408 F.3d 803 at 815.  And here, Moody's and O'Brien's alleged conduct bears little relationship to the customs described above.  The present claim is not that Moody or O'Brien missed some evidence of Hoffman's suicidal behavior because they failed to check on him as often as internal policy required; instead, Lawrence claims that each officer *did* perceive a strong risk that Hoffman would commit suicide, and deliberately chose to disregard this risk.  That is a qualitatively different claim, and requires a qualitatively different body of supporting evidence.[19]

---

[19]  Although the parties have not raised this issue in their briefs, the Court does note that some case law of this Circuit recognizes the possibility that "a municipality [may] be held liable in the absence of any

Despite the substantial evidence of customary mismanagement at MCDC, nothing in the record indicates that these customs actually caused Moody or O'Brien to *perceive and then disregard* Hoffman's strong suicidal tendencies. In fact, the record suggests that MCDC has little or no history of disregarding an inmate's known or obvious suicide risks. Every jail deputy, for example, attends a required annual in-service mental health training session, which includes lessons in suicide prevention. [R. 156-13 at 32-33; R. 156-5 at 39-40.] The facility was also an early adopter of a voluntary, statewide mental health triage program for at-risk inmates. [R. 156-32 at 12.] This program provides correctional officers with a mental health crisis hotline; if officers encounter an inmate in distress, they can call mental health professionals at the hotline to do a "mental health risk assessment" and recommend "treatment protocols for mental health risks." [*Id.* at 10.] The program's jail triage coordinator testified that, based on her long history of interacting with MCDC officers, she believes the facility "take[s] mental health risks seriously" and "demonstrate[s] understanding of [those] risks." [*Id.* at 36-37.] She also indicated that the number of calls made by MCDC personnel to the hotline was "right on target as for what I would expect." [*Id.* at 34.] Likewise, when asked whether MCDC had "a history or practice of not getting people mental health help when they needed it before Hoffman," Detective Keeton responded, "I know that when I arrested someone, if I brought them in there

---

employee's committing a constitutional violation." *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005). But the primary justification for this potential exception is that that the municipal liability standard does not import the "clearly established" language of qualified immunity, and thus "[w]hen an officer violates a plaintiff's rights that are not 'clearly established,' but a city's policy was the 'moving force' behind the constitutional violation, the municipality may be liable even though the individual officer is immune." *Id.* Here, the remaining Defendants—including those involved in the falsification of check-in logs—were not strictly absolved by qualified immunity; rather, they escaped liability because the evidence fails to suggest that they showed "deliberate indifference" in violation of the Eighth Amendment. In any case, relying upon the same facts described in the body of the discussion below— including the lack of prior suicides at the facility, the lack of any obvious indication to Greene that Hoffman was suicidal, and the officers' history of reporting suicidal behavior as frequently as other facilities—the Court finds no reasonable basis for equating the County's alleged custom of falsifying check-in logs with "deliberate indifference" to an obvious risk that Hoffman would commit suicide.

and they made suicidal statements, the jail did take those serious[ly]." [R. 154-5 at 37.]

The record also indicates that MCDC does not have a significant history of inmates committing suicide. In the past 30 years, Thomas can recall only one or two suicide attempts at the facility. [R. 154-30 at 130-31.] The record suggests, too, that officers took the suicide risks of other inmates seriously even during the period of Hoffman's incarceration. The two principal witnesses in this case, Foster and Isaacs, were both on suicide watch during this time period. When Foster told officers that he wanted to "have them shoot me," Dunning placed him on suicide watch. [R. 156-25 at 51.] And when Isaacs repeatedly told O'Brien that he "wanted to hurt [him]self," O'Brien put him "in [a] smock" and placed him on suicide watch. [R. 156-29 at 8.]

Upon careful review of the record, the Court finds ample evidence to conclude that Thomas encouraged a culture of disregard for certain facility policies. What the Court does not find, however, is any evidence that Thomas encouraged or permitted deliberate indifference to inmates' known or obvious suicide risks. Although the Court's investigation into one type of alleged misconduct—here, deliberate indifference to Hoffman's strong suicidal tendencies—may also reveal a custom of largely unrelated misconduct—there, the lack of ordered disciplinary procedures and falsification of check-in logs—this incidental discovery does not permit the Court to make the County liable for Moody's and O'Brien's behavior. Because the record fails to reveal a "permanent and well settled custom" of the County that served as the "moving force" behind Moody's or O'Brien's allegedly unconstitutional conduct, the law cannot hold the County liable for these officers' choices. *Monell,* 436 U.S. at 691.

**E**

Next, the Court must address Lawrence's remaining claims under Kentucky law.  A few these claims plainly fail, and the Court will briefly address them at the outset.  To begin, the doctrine of sovereign immunity bars any state law claims against (1) Madison County or (2) the individual Defendants in their official capacities.  This doctrine "precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity," and "[t]he absolute immunity from suit afforded to the state also extends to public officials sued in their representative (official) capacities, when the state is the real party against which relief in such cases is sought."  *Yanero v. Davis*, 65 S.W.3d 510, 517-18 (Ky. 2001); *see also Jones v. Cross,* 260 S.W.3d 343, 345 (Ky. 2008) (holding "claims alleging negligent operation of the jail" are "claims against the county," and "[t]his cloaks the jailer, in his official capacity, with the county's sovereign immunity.").

Next, the Court must dismiss Lawrence's claim that the Defendants "destroyed, concealed, removed, and/or altered" check-in logs that "they knew would have to be produced and/or used in an official proceeding which would occur due to the death of Charles Hoffman." [R. 1 at 9.]  This alleged activity occurred after Hoffman's death and therefore caused no legally cognizable injury to Hoffman.  And even if the Court could identify an injury, Kentucky law creates no private right of action for evidence tampering.  *Monsanto Co. v. Reed*, 950 S.W.2d 811, 815 (Ky. 1997) (noting Kentucky courts may only "counteract a party's deliberate destruction of evidence with jury instructions and civil penalties," and declining plaintiff's "invitation to create a new tort claim" for tampering with evidence); *Bandy v. Norfolk S. Ry. Co*., 2006 WL 1045491, at *3 (Ky. App. Mar. 31, 2006) (relying on *Monsanto* to reject plaintiff's tampering with evidence claim and finding "no basis for that action in Kentucky law.").

36

Third, Lawrence's "outrage" claim also fails.  This tort "is intended as a 'gap-filler,' providing redress for extreme emotional distress where traditional common law actions do not." *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. App. 2001).  But "[w]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie."  *Id.*; *see also Bennett v. Malcomb*, 320 S.W.3d 136, 137 (Ky. App. 2010) ("[B]ecause recovery could appropriately be sought under the traditional common law torts and the evidence shows the actions were not intended to only cause emotional distress, a cause of action for outrage is not appropriate.").

Lawrence does not argue that the Defendants' actions were "intended to only cause extreme emotional distress," and the Court finds no evidence to support this claim.  In her response to Greene's motion, however, Lawrence argues that "while this tort has often been referred to as a gap filler tort, in the event the Court dismisses the other state claims (which it should not), then this claim is absolutely viable."  [R. 160.]  Even accepting that this claim turns viable once the Court dismisses other state law claims against a Defendant, "emotional distress, standing alone, does not result in liability from an actor's conduct unless his intentional (or reckless) conduct is aimed toward causing emotional distress, is outrageous, and does cause severe emotional distress."  *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012).  As explained below, the Court will only dismiss Lawrence's traditional tort claims against Defendants Roberts and Dunning.  The Court has already addressed both of these Defendants' actions in the context of Lawrence's deliberate indifference claims; relying upon the same facts provided in that discussion, the Court finds no evidence that these Defendants' choices were "outrageous" or

"aimed toward causing" Hoffman severe emotional distress.  *See id.*

Lawrence's final claims of negligence and gross negligence require a more thoughtful analysis.  Like their federal counterparts, these claims must overcome the Defendants' qualified immunity from suit.  Kentucky provides qualified immunity to "public officers and employees for "(1) discretionary acts or functions . . . ; (2) [exercised] in good faith; and (3) within the scope of the employee's authority."  *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero* 65 S.W.3d at 522)).  The plaintiff bears the burden of demonstrating that a public employee acted in bad faith.  *Yanero*, 65 SW.3d at 523.  To carry this burden, the plaintiff must show that the defendant violated "a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness; *or* [that] the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive."  *Id.* (emphasis in original) (internal quotations omitted) (citations omitted).  Officials are "not liable for bad guesses in gray areas," and "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (internal quotations omitted) (citations omitted).

As the Court's thorough discussion of Lawrence's deliberate indifference claims demonstrates,[20] the record suggests that Roberts and Dunning only witnessed Hoffman's periodic mood swings and aggressive behavior.  None of this behavior was self-directed, and the officers had no reasonable grounds for concluding that Hoffman posed a serious risk of suicide.

---

[20] In *Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010), the Sixth Circuit found that a district court erred when it "did not sufficiently distinguish deliberate indifference from gross negligence and did not recognize that deliberate indifference is a more stringent standard."  *Id.* at 947.  By referring back to the facts relevant to Lawrence's deliberate indifference claims, the Court is not conflating these two standards.  Rather, the Court recognizes only that the same facts are relevant to each inquiry.  In the analysis below, the Court will apply only the pertinent state law standards to Lawrence's claims.

At best, this evidence might indicate that the Defendants made "bad guesses in gray areas." *Sloas*, 201 S.W.3d at 475. But the Court finds no evidence reasonably suggesting that either Defendant violated a "clearly established right which a person in [their] position presumptively would have known was afforded to" Hoffman. *Id.*

Lawrence's claims against Moody and O'Brien, however, must proceed. Because the facts reasonably suggest that (1) Moody and O'Brien perceived an obvious risk that Hoffman would commit suicide and (2) they nevertheless failed to place him on suicide watch or otherwise provide him with necessary medical care, the Court finds sufficient evidence to infer that each Defendant knowingly violated Hoffman's clearly established rights. For the same reason, the record also reasonably supports Lawrence's claims that these officers breached a duty of care to Hoffman, and that their conduct expressed "an utter and wanton disregard of the rights of [Hoffman] as from which it may be assumed the act was malicious or willful." *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001). A jury could therefore find Moody and O'Brien liable for negligence and gross negligence. *Cf. Jones v. Muskegon County*, 625 F.3d 935, 947 (6th Cir. 2010) (noting that deliberate indifference under federal law requires "a more stringent standard" than gross negligence under state law). Because other witnesses clearly dispute Foster's and Issacs's account of what Hoffman told Moody and O'Brien, however, the Court must leave the ultimate resolution of this issue to the trier of fact.

Lawrence's negligence claims against the last two Defendants, Greene and Thomas, emerge from a different set of facts. These claims relate to (1) Greene's failure to check on Hoffman for almost four hours prior to his discovery and (2) Thomas's acquiescence to the habitual failure of Greene and others to check on inmates as often as MCDC policy required. For these failures, Green and Thomas are not entitled to qualified immunity. Kentucky law

grants qualified immunity only to officers performing "discretionary acts or functions." *Yanero*, 65 S.W.3d at 522. Courts distinguish these "discretionary acts" from simply "ministerial" duties, which impose obligations that are "absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." [21] *Sloas*, 201 S.W.3d at 478.

Here, a case of this Circuit, *Hedgepath v. Pelphrey*, 520 Fed. Appx. 385, 390-91 (6th Cir. 2013), is particularly helpful. In *Hedgepath*, the defendants "were required to ensure the safety of intoxicated detainees by checking on them every twenty minutes to make sure they were conscious." *Id.* a 390. The court, interpreting Kentucky law, found that this policy did not impose a duty "to make a subjective medical determination," but rather obligated the defendants to follow "a relatively straightforward policy with unambiguous instructions." *Id.* at 390-31. Because this policy "did not require the type of 'personal deliberation, decision, and judgment' needed to render it discretionary," the court held that the defendants' duties were ministerial. *Id.* at 391 (quoting *Yanero*, 65 S.W.3d at 522). The court also determined that the duties of both the deputy jailers *and* their supervisor were ministerial in this context.[22] This was true because

---

[21] The Court recognizes that this "discretionary vs. ministerial" distinction may also apply to qualified immunity in the federal context. *See Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007). But the Court's resolution of Lawrence's constitutional claims against Greene and Thomas did not turn on qualified immunity. The "deliberate indifference" standard is a creature of the Eighth Amendment, not strictly a product of officers' qualified immunity from suit. *See, e.g., Davis v. Fentress County Tennessee*, 6 Fed. Appx. 243, 249 (6th Cir. 2001) (finding that "[w]hen prison officials act with deliberate indifference to the serious medical needs of prisoners so that they inflict unnecessary pain or suffering, their actions violate the Eighth Amendment," and "[p]retrial detainees enjoy analogous protection under the Fourteenth Amendment's Due Process Clause."); *Hope v. Pelzer*, 536 U.S. 730, 736-38 (2002) (recognizing "deliberate indifference" and "qualified immunity" inquiries as analytically distinct). The Court rejects Lawrence's constitutional claims against Greene and Thomas not simply because they are entitled to qualified immunity, but because the record fails to show that they violated the Eighth or Fourteenth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (holding that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" under the Eighth Amendment.)

[22] The Court should note that neither party clearly delineates the distribution of responsibilities at MCDC. Although it appears that Dunning operated in some sort of supervisory capacity, Lawrence sues only Thomas for failure to supervise and train. She does not otherwise cite any facts suggesting that Dunning

"deciding on the content of policies and training is a discretionary function, [but] the training of employees to adhere to their duties once that content is decided is a ministerial function." *Id.* at 391 (citing *Yanero*, 65 S.W.3d at 522). Likewise, "the supervision of employees is a ministerial act when it merely involves enforcing known policies." [23] *Id.*

The same conclusion applies here. Greene and Thomas concede that, on the night of Hoffman's death, MCDC policy required officers to check on isolated inmates every 20 minutes. [R. 154-10 at 73; R. 154-30 at 139.] This policy did not encourage officers to check on inmates as often as they found necessary or reasonable; the policy unambiguously imposed a duty to perform a concrete act at a fixed interval, with no built-in discretion to deviate from that duty. Substantial evidence also supports Lawrence's claim that officers routinely ignored and violated this policy, and that Thomas failed to take reasonable steps to enforce the requirement.[24] The check-in requirement thus imposed a ministerial duty, and the Defendants are not entitled to qualified immunity for allegedly breaching that duty.

Having stripped these Defendants of qualified immunity, the Court now asks whether the evidence reasonably supports Lawrence's claims of negligence and gross negligence against Thomas and Greene. Kentucky law "imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he

---

had authority to train or supervise officers with regard to the check-in policy. In the absence of any such citation, the Court finds insufficient evidence to hold Dunning liable for negligent training or supervision in this context. *Cf. In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (noting the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact").

[23] In a published 2014 opinion, the Sixth Circuit cited this same discussion and held "[w]e agree with the reasoning of *Hedgepath* and adopt it to resolve this appeal." *Finn v. Warren County, Kentucky*, 768 F.3d 441, 449 (6th Cir. 2014).

[24] Thomas did reportedly tell Detective Keeton that he "had talked to the staff about not" falsifying logs. [R. 154-5 at 37.] But there is no evidence that this alleged "talk" had any impact on the facility's custom of falsifying logs, nor is there any evidence that Thomas followed up with officers after it became clear that his "talk" had failed to cure the problem.

cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Sloas*, 201 S.W.3d at 479.  Instead, "[t]he duty of ordinary care to prevent [harm] arises only upon the discovery of some fact which would lead a reasonable person to believe there is some likelihood of . . . injury."  *Id.* at 479; *see also Sudderth v. White*, 621 S.W.2d 33, 35 (Ky. App. 1981) ("The majority of jurisdictions recognize a rule that if a jailer knows or has reason to believe that a prisoner might do harm to himself, he has a duty to exercise reasonable care to assure that such harm does not occur.")

In her motion for summary judgment, Greene attempts to obscure this standard by leading the Court down the wrong precedential path.  Rather than address the standard for *ministerial* acts performed by officers in this context, Greene highlights only cases exploring the standard for the *discretionary* acts of these officers.  In *Sloas*, for example, the Kentucky Supreme Court held that there had to be "some implication of self-interest, or a deliberate indifference, or sinister motive, rather than an honest mistake or oversight," before the court could find the defendants liable for an inmate's suicide.  *Sloas*, 201 S.W.3d 469, 485.  But *Sloas* only applied this standard *after* determining that the defendants were entitled to qualified immunity; the question, then, was not whether the defendants were merely negligent, but whether they acted in bad faith.  *See id.*  Similary, in *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636 (Ky. App. 2011), the court absolved the defendants of liability only after finding that their actions were "inherently discretionary," and thus they were immune from suit absent a showing of bad faith.  *Id.* at 640-641.

The "bad faith" element of Kentucky's qualified immunity test closely follows the standard for "deliberate indifference" under federal law.  *Compare Barber v. City of Salem, Ohio*, 953 F.2d 232, 239-40 (6th Cir. 1992) (holding the relevant question under § 1983 is

"whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."); *Sloas*, 201 S.W.3d 469, 485 (noting bad faith requires "some implication of self-interest, or a deliberate indifference . . . rather than an honest mistake or oversight" in connection with inmate's suicide).  Greene would apparently have the Court collapse all three of the standards outlined above into a single test—if she did not actually perceive a substantial risk that Hoffman would commit suicide, she must not be liable for deliberate indifference, bad faith, or even negligence.  But courts do not so conflate deliberate indifference with negligence.  Federal law, for example, consistently distinguishes between these two standards.  *See, e.g., Linden v. Washtenaw County*, 167 Fed. Appx. 410, 416 (6th Cir. 2006) (noting the deliberate indifference standard "requires that the defendant's *mens rea* be higher than negligence").

And in its discussion of negligence, the Kentucky Supreme Court held that "[t]he duty of ordinary care to prevent [harm] arises only upon the discovery of some fact which would lead *a reasonable person* to believe there is *some* likelihood of . . . injury." *Id.* at 479 (emphasis added).  *Sudderth*, too, found only that "if a jailer knows or has *reason to believe* that a prisoner *might* do harm to himself, he has a duty to exercise reasonable care to assure that such harm does not occur." *Sudderth*, 621 S.W.2d at 35 (emphasis added).  The negligence standard under Kentucky law, then, does not require actual knowledge that an inmate is suicidal.  Rather, the critical question springs from the touchstone of almost every negligence inquiry under the common law—namely, whether the harm caused by the defendant's action was reasonably foreseeable.[25]

---

[25]  The Court does note that dicta in a case of this Circuit, *Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990), once cited *Sudderth* for the proposition that "[w]here a person *known to be suicidal* is placed in the

This is not to say that Greene's knowledge, or lack thereof, is irrelevant to the Court's analysis. But consider the implications of holding that Greene must escape liability for negligence simply because she did not actually perceive an obvious risk that Hoffman would commit suicide. The record supports a reasonable inference that Greene failed to perceive Hoffman's suicidal tendencies *precisely because* she did not check on him at all in the almost four hours leading up to his discovery. The record, too, reasonably supports Lawrence's claim that Greene's failure to check on Hoffman resulted from Thomas's long history of permitting officers to falsify check-in logs and ignore isolated inmates for hours at a time. The intersection between Greene's proposed statement of the law and the present facts, then, would risk creating an intolerable outcome—the facility's longstanding practice of ignoring isolated inmates would *itself* shield individual officers from liability. This holding would supply perverse incentives to jails and prison systems, encouraging supervisors to avoid placing officers in a position to observe an inmate's suicidal tendencies. Suppose, for example, that a jail policy instructed or permitted officers not to check on isolated inmates at all—no officer could be liable for disregarding a risk that the inmate might harm himself, because no officer would have a chance to observe this behavior. That cannot be the standard. There must be some outer boundary of acceptable care beyond which the likelihood of self-harm, even in the absence of actual notice, becomes reasonably foreseeable.

---

direct care of a jailer or other custodian . . . and the custodian negligently fails to take appropriate measures to guard against the person's killing himself, the act of self-destruction may be found to have been a direct and proximate consequence of the custodian's breach of duty." *Id.* at 383 (emphasis added). This is an accurate characterization of *Sudderth*'s unique facts, but not an accurate statement of the basic legal principle established in the case. The court in *Sudderth* expressly held that an officer need only have some "*reason to believe* that a prisoner *might do harm to himself*" before assuming "a duty to exercise reasonable care to assure that such harm does not occur." *Sudderth*, 621 S.W.2d at 35 (emphasis added). And as the court also noted, "[u]ltimate liability of course depends upon the particular circumstances of each case." *Id.*

The Court need not draw that boundary today.  It is enough to conclude that a reasonable jury, considering the facts actually in the record, could find that Greene and Thomas had "reason to believe that" an inmate in Hoffman's position "might do harm to himself," and failed "to exercise reasonable care to assure that [this] harm [did] not occur."  *Sudderth*, 621 S.W.2d at 35. Admittedly, some of these facts support the Defendants' claims.  The fact that Thomas can only recall one or two other suicide attempts in his time at MCDC, for example, strengthens the Defendants' argument that Hoffman's death was not reasonably foreseeable.  But other facts bolster the opposite conclusion.  Thomas confirmed in his deposition that, through his training, he knew "being placed in isolation can lead to depression, anxiety, emotional problems, [and] possibly suicidal thoughts."  [R. 154-30 at 43.]  He also agreed that these risks explain "why it's important for deputies to go around and talk to the inmates and make sure they're okay," just to "make sure they're getting some sort of contact with a human being."  [R. 154-30 at 44.]  Jamie Lynn, a lieutenant at the facility, also testified that the purpose of checking on isolated inmates every 20 minutes was "to check on [their] safety" and "[m]ake sure they're not harming themselves."  [R. 154-34 at 16.]  And Katsaris, Lawrence's expert in training officers to handle prisoners' mental health issues, testified that "if you're falsifying records, you are undermining the entirety of your responsibilities to the individuals who are placed in the facility under your care," and in this case, "that falsification ha[d] an impact on [Hoffman's] care and intervention." [*Id.*]

Despite the potential foreseeability of these risks, the record strongly indicates that Thomas and Greene habitually violated the facility's check-in policy.  The record suggests, too, that officers did not just exceed the required check-in period by a few minutes, but sometimes failed to check on inmates for hours at a time.  Inmate Curtis Broughton, for example, testified

that officers often didn't check on inmates for an "hour, hour and 45 minutes, maybe longer sometimes." [R. 162-16 at 51-52.] Of course, the record also indicates that, in the almost four hours before she discovered Hoffman dead in his cell, Greene failed to check on him at all. These facts reasonably suggest that Greene and Thomas (1) were aware that placing an inmate in isolation increased the inmate's risk of depression and suicide, (2) were likewise aware that the facility's check-in policy specifically aimed to reduce this risk, and (3) nevertheless ignored and repeatedly violated this policy.

Even after showing that these Defendants breached a duty to Hoffman, however, Lawrence must still establish causation. Under Kentucky law, a plaintiff may show legal causation by demonstrating that the defendant's conduct was "a substantial factor in bringing about the harm." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 92 (Ky. 2003). The term "substantial" is "used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense . . . rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Id.* (citation omitted). The Court has a "duty to determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Id.*

Greene argues that Lawrence has failed to carry her burden of showing causation because "[she] cannot establish time of death, and therefore cannot establish that it is more probable than not that if a cell check had been performed timely, [ ] Mr. Hoffman would be alive." [R. 157-1 at 40.] There are two problems with this claim. First, Jimmy Cornelison, the coroner who pronounced Hoffman dead on the night of his suicide, estimated that his time of death was 7:30,

almost 2.5 hours after Greene last checked on Hoffman.  [R. 179 at 78.]  Although Cornelison

admitted that Greene's falsified check-in logs "could have been part of" the information he

considered before estimating the time of death, he also clarified that coroners "really have to

have more" than information about the last check-in before making a time of death call, and "I

go by what I see on the body."  [*Id.* at 75, 28.]  And when asked whether it was possible that

Hoffman committed suicide less than 20 minutes after Greene last checked on him, Cornelison

responded, "I don't think so.  I think there's too much time."  [*Id.* at 30.]

Second, the relevant factual dispute does not concern only Hoffman's time of death.

Lawrence also argues that, based on the evidence gathered in the aftermath of Hoffman's suicide,

it "would have taken [him] a very significant amount of time" to complete the suicidal act.  [R.

162 at 4.]  The record suggests that Hoffman began this process by taking a plastic bag and

"twisting it up like a shoelace," then threading this strand through a tiny hole in an air vent at

least seven feet above the floor, which would have required Hoffman to stand on top of the cell's

commode.  [R. 162-5 at 28, R. 162 at 4.]  Attached exhibits support this description of

Hoffman's cell.  [R. 162-6 at 2-3.]  In his deposition testimony, Moody also confirmed that the

hole through which Hoffman threaded the plastic strand was "smaller than the tip of [a] finger."

[R. 162-5 at 24-25.]  Hoffman then somehow tied one end of this strand to his bedsheet, and later

wrapped the other end around his neck.  [*Id.* 5-6.]  Lawrence's medical expert testified that, even

after Hoffman completed this process, it might have taken him "several minutes" to lose

consciousness and pass away.  [R. 162-33 at 19.]

This evidence creates a genuine issue of material fact about (1) the reliability of

Cornelison's on-scene assessment of Hoffman's time of death and (2) the amount of time it took

Hoffman to complete the suicidal act.  The Court also finds that this evidence, coupled with the

other facts discussed above, could "lead reasonable [jurors] to regard" Greene's failure to check

on Hoffman for almost four hours as a "substantial factor" in his ultimate suicide. *Hammons*,

113 S.W.3d at 92. Similarly, the facts also reasonably suggest that, if Thomas had not

customarily permitted officers to violate this policy, Greene would not have chosen to ignore the

check-in requirement on the night of Hoffman's death. And this closely linked chain of

causation—Thomas's repeated acquiescence, Greene's resulting violation, and Hoffman's

suicide—is not so attenuated to establish causation in only the "'philosophic sense,' which

includes every one of the great number of events without which any happening would not have

occurred."[26] *Id*. Thus, the available facts—while disputed—reasonably support Lawrence's

claim that (1) Thomas and Greene carried a duty to prevent the foreseeable risk of harm caused

by failing to check on isolated inmates for hours at a time, (2) the Defendants breached that duty,

and (3) this breach was a substantial factor in Hoffman's death.[27]

　　　　Lawrence's claim of gross negligence, however, cannot proceed. As previously stated,

gross negligence under Kentucky law requires not only evidence of a failure to exercise

reasonable care, but something more—the plaintiff must show that this failure amounted to "an

utter and wanton disregard of the rights of others as from which it may be assumed the act was

---

[26] The Court adds again that finding a lack of causation here would risk supplying perverse incentives to jails and prison systems—the record reasonably suggests that the parties cannot agree upon the approximate time of Hoffman's death *precisely because* Greene failed to check on him for almost four hours before discovering his body. Taken to its logical conclusion, Greene's argument—that Lawrence cannot show causation because no one was around to observe Hoffman's behavior—would absolve officers of negligence even if they failed to check on inmates at all.

[27] As a final side note, all of Lawrence's claims about the falsification of check-in logs on the evening in question relate to Greene. There is no express indication that any other Defendant was responsible for checking on Hoffman every 20 minutes during the disputed period. Lawrence apparently does not argue that any other Defendant carried this duty, and even if she did, she has failed to point the Court's attention to any evidence establishing that duty. As noted above, the trial court is under no obligation to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). And even if the Defendants otherwise breached a duty to check on Hoffman in the days preceding his death, the intervening check-ins of Greene and others would break the relevant chain of causation.

malicious or willful." *Brown*, 63 S.W.3d at 181 (internal quotations omitted) (citation omitted). That "something more" is missing here.  There is no evidence that Thomas or Greene were on actual notice of Hoffman's suicidal tendencies, nor is there any evidence that the Defendants consciously disregarded a significant risk that failing to check on isolated inmates would result in Hoffman's—or any other inmate's—death.  Although this risk may have been foreseeable, it was not so clear that a reasonable jury could find "an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious or willful." *Id.*

**F**

The last issue concerns Lawrence's claims for punitive damages.  A plaintiff may recover punitive damages under § 1983 "when the defendant acts with reckless or callous indifference to the federally protected rights of others." *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986).  In *Gibson v. Moskowitz*, 523 F.3d 657 (6th Cir. 2008), the Sixth Circuit held that the standards for finding "deliberate indifference" under § 1983 and "callous indifference" under a punitive damages claim are "consistent," and "much of the evidence bearing on the one question bears on the other." *Id.* at 664 (internal quotations omitted) (citations omitted).  The court then reviewed the facts relevant to the plaintiff's deliberate indifference claim, and concluded that "[o]n these facts, the trial court permissibly delegated the question of punitive damages to the jury." *Id.*  The same analysis applies to the conduct of Moody and O'Brien.  The record reasonably suggests that these officers were actually aware of Hoffman's strong suicidal tendencies, though each disregarded this obvious risk.  The Court thus finds sufficient evidence of the officers' alleged "callous indifference" to support "delegat[ing] the question of punitive damages to the jury." *Gibson*, 523 F.3d at 664.  Likewise, the standard for awarding punitive damages under Kentucky law is coextensive with the standard for gross negligence. *See Phelps*

49

*v. Louisville Water Co*., 103 S.W.3d 46, 51 (Ky. 2003).  Having already found sufficient evidence to support Lawrence's gross negligence claims against Moody and O'Brien, the Court must also preserve her request for punitive damages.

As for the remaining Defendants, the Court cites the previous discussion of their involvement in Hoffman's death.  Because the record does not suggest that these officers were aware of a strong risk that Hoffman would commit suicide or that they showed reckless disregard for this risk, Lawrence's claims for punitive damages against Defendants Roberts, Dunning, Thomas, and Greene must fail.

### III

For all the reasons explained above, Lawrence's Motion for Summary Judgment **[R. 154]** is **DENIED.**  Taken in a light most favorable to the Defendants, the Court finds that the record fails to support the majority of Lawrence's claims.  And among those claims that do carry sufficient factual support, the Court holds that these claims raise material factual disputes better left to a jury.

The related motions of the Madison County Defendants and Greene **[R. 156, 157]**, however, are **GRANTED IN PART**.  Even considered in a light most favorable to Lawrence, the Court determines again that the record fails to support the majority of her claims.  But other facts, while disputed, do provide reasonable support for the allegations specified below. Accordingly, having carefully considered the record, the Court **HEREBY ORDERS** as follows:

1.      The Madison County Defendants' motion for summary judgment with respect to Lawrence's individual-capacity claims of (1) deliberate indifference, negligence, and gross negligence against Defendants Shawn Moody and Tyler O'Brien is **DENIED**;

50

2.      The Madison County Defendants' motion for summary judgment with respect to Lawrence's individual-capacity negligence claim against Defendant Doug Thomas is **DENIED**;

3.      Defendant Christina Greene's motion for summary judgment with respect to Lawrence's individual-capacity negligence claim is **DENIED**; and

4.      With respect to all other claims contained in the motions of both (1) the Madison County Defendants and (2) Christina Greene, summary judgment is **GRANTED** in favor of each Defendant.


This 31st day of March, 2016.


Gregory F. Van Tatenhove
United States District Judge